**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
THOMAS B. RUPP (Cal. Bar No. 278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Attorneys for Debtors and Debtors in
Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>SHIFT TECHNOLOGIES, INC., *et al.*,[1]<br><br>Debtors. | Case No. 23-30687 (Lead Case)<br><br>(Jointly Administered)<br><br>**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 363(f), AND FED. R. BANKR. P. 6004 (I) (A) APPROVING SALE PROCEDURES; (B) AUTHORIZING ENTRY INTO ONE OR MORE STALKING HORSE AGREEMENTS; AND (C) SETTING SALE HEARING; AND (II) AUTHORIZING DEBTORS TO SELL INTELLECTUAL PROPERTY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**<br><br>Date:  January 18, 2024<br>Time: 10:00 a.m. (Pacific Time)<br>Place: **Tele/Videoconference Appearances Only**<br>    United States Bankruptcy Court<br>    Courtroom 19, 16th Floor<br>    San Francisco, CA 94102 |

---

[1]     The last four digits of Shift Technologies, Inc.'s tax identification number are 5852.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Shift.  The Debtors' service address is 290 Division Street, Suite 400, San Francisco, California 94103.

# TABLE OF CONTENTS

I.     JURISDICTION .................................................................................................. 1

II.    SUMMARY OF RELIEF REQUESTED ........................................................... 1

III.   BACKGROUND .................................................................................................. 2

   A.   General Background .................................................................................... 2

   B.   The Assets .................................................................................................... 3

   C.   Marketing of the Assets .............................................................................. 4

   D.   The Sale Procedures ................................................................................... 5

   E.   Stalking Horse Agreement ......................................................................... 11

   F.   The Debtors' Secured Debt ....................................................................... 11

IV.    ARGUMENT ...................................................................................................... 12

   A.   Sale of the Assets Through the Sale Procedures Is Appropriate Under Section 363 and Will Maximize Value. ........................................................................................... 12

   B.   A Sale Free and Clear Under Section 363(f) Is Warranted. ............................................. 14

   C.   The Debtors Will Demonstrate at the Sale Hearing that the Successful Bidder Is Entitled to the Protections of Bankruptcy Code Sections 363(m) and (n).................................................. 14

   D.   Provision for Bid Protection in the Form of a Break-Up Fee and  Expense Reimbursement Has Become a Recognized and Necessary Practice ....................................... 15

V.     REQUEST FOR BANKRUPTCY RULE 6004 WAIVER .................................................. 17

VI.    NOTICE ............................................................................................................. 18

VII.   CONCLUSION .................................................................................................. 18

## **TABLE OF AUTHORITIES**

### **CASES**

*In re 995 Fifth Ave. Assocs.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1992) ............................................. 16

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) ................................. 15

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986) ............................... 12

*In re Bel Air Assocs., Ltd.*, 706 F.2d 301 (10th Cir. 1983) ......................................................... 15

*In re Castre*, 312 B.R. 426 (Bankr. D. Colo. 2004) ................................................................... 12

*In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) ................................................. 12

*In re CXM, Inc.*, 307 B.R. 94 (Bankr. N.D. Ill. 2004) ................................................................ 17

*In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del., Feb. 11, 2015) .................... 17

*In re Integrated Res.*, 147 B.R. 650 (S.D.N.Y. 1992) ................................................................. 16

*In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848 (Bankr.

    S.D.N.Y. 1992) ...................................................................................................................... 16

*In re Pisces Leasing Corp.*, 66 B.R. 671 (E.D.N.Y. 1986) .......................................................... 15

*In re Point Blank Solutions, Inc.*, Case No. 10-11255 (PJW) (Bankr. D. Del.

    Oct. 5, 2011) ........................................................................................................................... 17

*In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665 (9th Cir. 2007) ....................................... 13

*In re Rock Indus. Mach. Corp.*, 572 F.2d 1195 (7th Cir. 1978) ................................................. 15

*In re Sasson Jeans, Inc.*, 90 B.R. 608 (S.D.N.Y. 1988) .............................................................. 15

*In re Verity Health Sys. Of Cal., Inc.*, Case No. 2:18-bk-20151-ER (Bankr. C.D.

    Cal., Apr. 1, 2020) .................................................................................................................. 17

*In re Walter*, 83 B.R. 14 (9th Cir. 1988) ................................................................................... 12

*Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW),

    1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) ........................................................................ 15

### **STATUTES**

11 U.S.C. § 105 .............................................................................................................................. 2

11 U.S.C. § 105(a) ........................................................................................................................ 12

11 U.S.C. § 1107(a) ....................................................................................................................... 2

1    11 U.S.C. § 1108 ...................................................................................................... 2

2    11 U.S.C. § 363 .................................................................................................... 12

3    11 U.S.C. § 363(b) ............................................................................................... 2

4    11 U.S.C. § 363(b)(1) ........................................................................................ 12

5    11 U.S.C. § 363(f) ................................................................................................ 2

6    11 U.S.C. § 363(f)(1)-(5) ................................................................................. 14

7    11 U.S.C. § 363(m) ..................................................................................... 7, 14, 15

8    11 U.S.C. § 363(n) ........................................................................................ 14, 15

9    11 U.S.C. § 503(b) ........................................................................................ 7, 17

10    28 U.S.C. § 1334 .................................................................................................. 1

11    28 U.S.C. § 1408 .................................................................................................. 1

12    28 U.S.C. § 1409 .................................................................................................. 1

13    28 U.S.C. § 157 ..................................................................................................... 1

14    28 U.S.C. § 157(b) ............................................................................................... 1

15    **RULES**

16    Fed. R. Bankr. Proc. 2002 .............................................................................. 18

17    Fed. R. Bankr. Proc. 2002(a) ........................................................................ 18

18    Fed. R. Bankr. Proc. 2002(c) ........................................................................ 18

19    Fed. R. Bankr. Proc. 6004 .............................................................................. 2

20    Fed. R. Bankr. Proc. 6004(f) ........................................................................ 12

21    Fed. R. Bankr. Proc. 6004(h) ....................................................................... 17

22    L.B.R. 5011-1(a) ................................................................................................ 1

23

24

25

26

27

28

Shift Technologies, Inc. and certain of its affiliates that are the above-captioned debtors and debtors in possession (collectively, "Shift," the "Debtors," or the "Company") move this Court pursuant to sections 105(a), 363(b), and 363(f) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (the "Sale Procedures Order"), substantially in the form attached hereto as **Exhibit A**, (i) (a) authorizing and approving the Sale Procedures (as defined herein) for the sale of the Debtors' intellectual property and related intangible Assets (as defined herein); (b) authorizing the Debtors to enter into one or more "stalking horse" asset purchase agreements, subject to higher and better bids; and (c) setting the time, date and place of a hearing (the "Sale Hearing"); and an order (the "Sale Order") (ii) authorizing and approving (a) the sale of the Debtors' right, title and interest in the Assets, free and clear of all liens, claims, encumbrances, and interests (each as described below), pursuant to section 363 and/or 11123(a)(5)(D) of the Bankruptcy Code; and (b) payment of Bid Protections (as defined below), if applicable; and (iii) granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors submit the declaration of David Peress (the "Peress Declaration") and respectfully represent as follows:

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     JURISDICTION**

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**II.     SUMMARY OF RELIEF REQUESTED**

Through this Motion, the Debtors seek authority to sell the Assets (the "Asset Sales") through the procedures proposed herein (the "Sale Procedures"). In particular, the Debtors are seeking approval of a Bid Deadline (defined below) of January 23, 2024, and Auction (defined

below) of January 25, 2024. The Debtors request entry of an order, pursuant to sections 105, 363(b), and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004, authorizing the Assets to be sold in accordance with the Sale Procedures, and approving the Asset Sales, free and clear of all liens, claims, encumbrances, and interests.

**III.   BACKGROUND**

      **A.     General Background**

On October 9, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 7, 2023, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases. *See* Dkt. No. 118. No trustee or examiner has been appointed in the Chapter 11 Cases.

Prior to the Petition Date, Shift was a consumer-centric omnichannel retailer for buying and selling used cars, with headquarters in San Francisco and operations in Oakland and Pomona, California. Shift invested significantly in its technology platforms, as well as focusing on finding new ways to expand through investments and mergers, in an attempt to drive growth through volume and presence. As Shift continued to expend its available cash on technology development, capital markets in early-mid 2023 tightened, and Shift focused on profitability over growth, making it increasingly difficult to find capital to fund growth and operations absent immediate cash returns. It eventually became apparent that the Company would have significant difficulty continuing to invest in its ecommerce platform.

After the Company brought in new management experienced in the car dealership industry in June 2023, Shift decided to pivot entirely to a dealership model focused on profitable growth. By that time, however, the Company's liquidity had deteriorated, and Shift needed capital to see the results of the significant changes made to the operations of the business (under the leadership of new management) become profitable.

The Company was unable to secure any source of additional capital to fund continuing operations. On October 6, 2023, Shift announced that it would begin an orderly wind-down and

liquidation through these Chapter 11 Cases. That day, the Company closed its website and car lots in Oakland and Pomona and terminated approximately 80% of its workforce. The Debtors filed these Chapter 11 Cases to begin an orderly winddown, using cash on hand and cash generated by the liquidation of inventory through wholesale channels to provide the necessary liquidity to support the winddown and the chapter 11 process.

Additional information regarding the Debtors' businesses and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Jason Curtis in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 7] (the "<u>First Day Declaration</u>").

**B.   <u>The Assets</u>**

The Debtors' Assets contemplated to be sold under these proposed Sale Procedures include the Debtors' saleable interests in their brands and trademarks, domain names, customer data or transaction data if any,[2] patents, proprietary software, and other similar assets (the "<u>Assets</u>"). More specifically, the proprietary software includes technology developed and acquired by the Debtors, which was vertically integrated to provide robust business management and intelligence solutions for Shift and its B2B customers and to provide a user-friendly, omnichannel used car buying experience for consumers. By this Motion, the Debtors propose to offer to interested parties, through the Sale Procedures, the ability to acquire some or all of the Assets, including either the entirety of Shift's proprietary codebase or discrete modules of the platform.

The Assets include:

- Source code enabling:
  - Shift's proprietary pricing engine
  - Shift Dealership: a direct-to-consumer e-commerce platform
  - Shift Marketplace: a third-party marketplace for dealerships
  - Shift's dealership pricing engine as a service
  - Legacy source code enabling prior acquisition targets' technologies

---

[2] The Debtors' privacy policy states that the Debtors may share or disclose certain information in connection with or during negotiations of any merger, sale of company assets, financing, or acquisition of all or a portion of the Debtors' business to another company.

- United States registered trademarks for "Shift" and "CarLotz"
- 100+ domain names, including Shift.com, CarLotz.com, and Fair.com
- U.S. Issued Patent US10664808
- Social media accounts related to Shift, CarLotz, and Fair.com

The above list is a representative list of Assets to be offered for sale and will be more fully defined through definitive documentation of a transaction pursuant to the terms of the proposed Sale Procedures.

**C.** **Marketing of the Assets**

On November 10, 2023, the Debtors retained Hilco IP Services, LLC d/b/a Hilco Streambank to assist with the sale of the Assets. On December 1, 2023, the Debtors filed the *Application for Order Authorizing Retention of Hilco IP Services, LLC d/b/a Hilco Streambank as Debtors' Intellectual Property Advisor* [Dkt. No. 225] which was granted on December 20, 2023. *See* Dkt. No. 277. The Debtors engaged Hilco Streambank as their intellectual property advisor in connection with the review, compilation, and preparation for marketing and sale of their intangible assets, including but not limited to the Debtors' interests in their brands and trademarks, domain names, customer data, copyrights, patents, proprietary software, license agreements, IP addresses, and other similar assets. In an effort to maximize recovery value, the Debtors have focused on strategic and financial buyers interested in the software- and technology-related assets of Shift.

As of the date of this Motion, the marketing process has included the following efforts by the Debtors and Hilco Streambank:

- Diligence gathering and coordination between Hilco Streambank and the Debtors to compile and prepare offering materials.
- Preparation of opportunity offering collateral, including:
    - o Teaser
    - o Confidential information memorandum (CIM)
    - o Construction of a virtual data room (VDR)

- Creation of a high-priority buyer list through a combination of Hilco Streambank's proprietary contact database and targeted strategic and financial buyer research unique to this opportunity.
- Preparation of a form of NDA necessary to gain entry to the VDR.
- Multiple rounds of outbound outreach including:
  - Email blast deployment to Hilco Streambank proprietary database of contacts.
  - Direct email and phone outreach to high-priority targets.
  - Social media deployment to Hilco Streambank's LinkedIn and Twitter pages.
- Initial calls facilitated between the Debtors and buyers expressing early interest in software assets.

While the marketing efforts will proceed through the completion of the Sale Procedures, to date the Debtors, through Hilco Streambank, have contacted over 100 potential purchasers and have entered into NDAs with multiple interested parties, who have begun to conduct due diligence.

**D.     The Sale Procedures**

The Debtors have worked closely with Hilco Streambank over the past months and understand that the Sale Procedures set forth below represent the strategy most likely to yield the best results for sale of the Assets.

The Debtors request that the Court approve the following Sale Procedures for the Asset Sales, one or more of which procedures the Debtors reserve the right to waive or modify at any time in their reasonable discretion, in consultation with counsel for the Committee, in order to maximize the value of the Assets:

a. <u>Bid Deadline.</u> **January 23, 2024**. An interested party that desires to make a bid on the Assets (or a certain subset thereof) must deliver written copies of its bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to Hilco Streambank, Attn: David Peress (dperess@hilcoglobal.com), Jordon Parker (jparker@hilcoglobal.com), and Stella Silverstein (ssilverstein@hilcoglobal.com). As soon as reasonably practicable following the Bid Deadline, the Debtors will provide to counsel to the Committee copies of, or if appropriate, a compiled summary of, all Qualified Bids (defined below), with such distribution permissible by electronic means. The Debtors

may extend the Bid Deadline once or successively, but they are not obligated to do so; provided that, if the Debtors extend the Bid Deadline, they will promptly notify counsel for the Committee and all bidders who have entered into NDAs of such extension.

b. Qualified Bid. To be a qualified bid (a "Qualified Bid"), a bid must meet the following requirements, as determined by the Debtors in their reasonable business judgment in consultation with their advisors and after consultation with counsel for the Committee:

    i. Purchase Agreement. Enclose a proposed purchase agreement (the "Purchase Agreement") that specifically identifies the Assets proposed to be purchased, which may be all or a portion of the Assets, and the proposed consideration, and, if the Debtors prepare and upload into the VDR a form purchase agreement, a blackline against the Debtors' form purchase agreement;

    ii. Irrevocable. Confirm that the offer shall remain open and irrevocable, whether or not the bidder participates in the Auction(s), until the closing of an Asset Sale to the Successful Bidder or the Next Highest Bidder (each as defined herein);

    iii. Minimum Deposit. Be accompanied by a wire transfer in an amount equal to 10% of the purchase price identified in the Purchase Agreement as a minimum good faith deposit (the "Minimum Deposit"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid. The Successful Bidder(s) and Next Highest Bidder(s) may be required to top up their Minimum Deposits in an amount sufficient to equal 10% of their respective purchase prices at the conclusion of the Auction;

    iv. No Contingencies. Not be conditioned on obtaining financing or the outcome of any further due diligence by the bidder;

    v. Disclosure of Identity. Fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

    vi. Corporate Authority. Include written evidence reasonably acceptable to the Debtors demonstrating that the bidder has full power and authority (including full corporate or other organizational power and authority) to consummate the proposed transaction contemplated by the bid;

    vii. Proof of Financial Wherewithal. Include current financial bank statements, screenshot(s) of bank account balance(s), or a letter from the bank of the potential bidder that demonstrates (to the reasonable satisfaction of the Debtors) sufficient financial wherewithal to be able to close on a purchase of the Assets. The proof of financial wherewithal should contain the following: (i) bank name, (ii) name of the account holder, (iii) amount of available funds, (iv) date of the statement, screenshot, or letter indicating the availability of the funds, and (v) if the account holder is different from the bidding entity, additional documentation demonstrating the relationship between the two, such that the bid is not contingent on financing. Bidders should be prepared

to provide additional proof of financial wherewithal at the Auction in the event bidding exceeds the amount of wherewithal previously provided;

viii. <u>Affirmative Statement.</u> Contain an affirmative statement that: (i) the bidder submitting such bid has acted in good faith consistent with section 363(m) of the Bankruptcy Code and has not engaged in any collusion with respect to such bid, (ii) the bidder submitting such bid has and will continue to comply with these Sale Procedures, (iii) the bid does not entitle such bidder to, and such bidder disclaims any right to, any expense reimbursement or break-up, termination, or similar fee or payment (unless designated as a stalking horse bidder and approved by the Bankruptcy Court), and (iv) the bidder submitting such bid waives any substantial contribution (administrative expense) claims under section 503(b) of the Bankruptcy Code related to the bidding for the Debtors' Assets or otherwise participating in the Auction; and

ix. <u>Consent to Jurisdiction as Condition to Bidding.</u> Contain an affirmative statement that all entities that participate in the bidding process of the Auction shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of California with respect to all matters related to the terms and conditions of the transfer of the Assets, the Auction, and any transaction contemplated by these Sale Procedures.

c. <u>Stalking Horse</u>. At any time prior to the Bid Deadline, the Debtors, in consultation with counsel for the Committee, may enter into one or more asset purchase agreements, subject to higher and better bids, which will serve as the "stalking horse" bid for the Assets (each, a "<u>Stalking Horse Agreement</u>"). In the event that the Debtors enter into one or more Stalking Horse Agreements, with respect to which the prospective purchaser is not an insider of the Debtors, the Debtors may seek approval at the Sale Hearing of a break-up fee of no more than three percent (3%) of the purchase price of such Stalking Horse Agreement and an expense reimbursement not to exceed $50,000 (together, the "<u>Bid Protections</u>"). Promptly upon entering into a Stalking Horse Agreement, the Debtors shall notify all bidders who have entered into NDAs of the Debtors' entry into a Stalking Horse Agreement and shall provide such bidders with a copy of the Stalking Horse Agreement.

d. <u>Auction(s)</u>. If the Debtors receive more than one Qualified Bid for the Assets (or a certain subset of the Assets), the Auction(s) with respect to the Sale shall take place virtually on **January 25, 2024**, at 10:00 a.m. (Pacific Time), or such later time or different place as the Debtors may determine, so long as such change is communicated reasonably in advance by the Debtors to all bidders, counsel for the Committee, and other invitees.

e. <u>Auction Rules.</u> If one or more Auctions are held, the following rules for the Auction's conduct will be observed:

i. Only a bidder who has submitted a Qualified Bid by the Bid Deadline (a "<u>Qualified Bidder</u>") will be eligible to participate at the Auction and will be entitled to be present for all subsequent bids at the Auction, with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each subsequent bid at the

Auction will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to participate in the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction.

ii. A minimum bid amount for the Assets (or any portions thereof) may be announced to Qualified Bidders and/or posted by the Debtors prior to or at the commencement of the Auction. Such minimum bid amounts, if any, may be established based upon a variety of factors, including, but not limited to, the highest bids received prior to the Auction. The Debtors reserve the right to adjust any minimum bid amounts at any time within their discretion in order to maximize the value of the Assets.

iii. At the Debtors' discretion, bidding at the Auction may be conducted in one or multiple formats, including but not limited to, open cry or sealed bid, or a combination thereof, and may be modified throughout the Auction at the Debtors' discretion in order to maximize the value of the Assets, and the Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids or requiring subsequent bids be the Qualified Bidders' final and best bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Sale Procedures, the Local Rules, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction..

iv. At the Auction, Qualified Bidders will be permitted to increase their bids, and bidding at the Auction will continue until such time as the highest or otherwise best offer is determined in accordance with these Sale Procedures or until such Auction is adjourned by the Debtors. If adjourned, reasonable notice of the time and place for the resumption of the Auction will be given to all Qualified Bidders and counsel to the Committee. For the purposes of these Sale Procedures, each additional bid received by a Qualified Bidder at the Auction shall be deemed a Qualified Bid if, in the Debtors' sole opinion, such Qualified Bidder meets or could reasonably meet the requirements for a Qualified Bid.

v. Immediately prior to concluding the Auction, the Debtors shall, in consultation with their advisors and counsel for the Committee, (a) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale Procedures and the best interests of the Debtors' estates and creditors; (b) determine and identify the highest or otherwise best Qualified Bid (the "Successful Bid") and the Qualified Bidder submitting such bid (the "Successful Bidder"); and (c) have the right to reject any and all bids.

vi. Within one business day of the completion of the Auction, the Successful Bidder shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. The Debtors may, but are not required to, determine and identify the next highest or otherwise best Qualified Bid after the Successful Bid (the "Next Highest Bid") and the Qualified Bidder submitting such bid (the "Next Highest Bidder").

f.  <u>One Qualified Bid</u>.  If the Debtors only receive one Qualified Bid, the Debtors shall, after consultation with counsel for the Committee, determine whether to identify such Qualified Bid as the Successful Bid and promptly proceed to seek entry of the appropriate order approving the transaction with such bidder.

g.  <u>Acceptance of Successful Bid.</u>  If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid on the record at the Auction and (ii) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Court of the Successful Bid and the entry of an Order approving the Sale and such Successful Bid.  The Debtors will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Next Highest Bidder) upon the approval of such Successful Bid (or Next Highest Bidder if applicable) by the Court at the Sale Hearing.  The determination of the Successful Bid and Next Highest Bid by the Debtors, at the conclusion of the Auction, shall be final, subject to approval by the Court.  The Debtors' selection of and presentation to the Court of the Successful Bid and, if applicable, the Next Highest Bid will not constitute the Debtors' acceptance of either of such bids, which acceptance will only occur upon the approval of such bids by the Court at the Sale Hearing.

h.  <u>Notice of Successful Bid(s).</u>  As soon as reasonably practicable following the Debtors' receipt of the Successful Bidder's completed and executed agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made at the conclusion of the Auction(s), the Debtors shall file a Notice of Successful Bid(s).  The Notice of Successful Bid(s) shall identify the Successful Bidder(s) and the Next Highest Bidder(s), if any, the amount of the Successful Bid(s) and the Next Highest Bid(s), if any, and shall include a substantially final version of the Purchase Agreement.

i.  <u>Sale Hearing.</u>  The Debtors will seek entry of the Sale Order from the Court at the Sale Hearing to begin on or before **February 1, 2024**, at 10:00 a.m. (Pacific Time) to approve and authorize the sale transaction(s) to the Successful Bidder(s) on terms and conditions determined in accordance with the Sale Procedures.

j.  <u>Closing with Next Highest Bidder</u>.  Following Court approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Next Highest Bid will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effectuate an Asset Sale to the Next Highest Bidder subject to the terms of the Next Highest Bid of such Next Highest Bidder without further order of the Court. The Next Highest Bid shall remain open until the earlier of (a) the thirtieth (30th) calendar day following the conclusion of the Auction, unless, prior to such date, the Debtors have delivered written notice to the Next Highest Bidder that the transaction contemplated by the Successful Bid will not occur and the Debtors intend to consummate the transaction contemplated by the Next Highest Bid, in which case the terms of the Next Highest Bid shall be enforceable and shall govern or (b) the consummation of the Asset Sale to the Successful Bidder (the "<u>Next Highest Bid Expiration Date</u>").  All Qualified Bids other than the Successful Bid and the Next Highest Bid shall be deemed rejected by the Debtors on and as of the date of approval of the Successful Bid and the Next Highest Bid by the Court.

k. <u>Minimum Deposits</u>.  The Minimum Deposit of any Next Highest Bidder shall be retained by the Debtors until the Next Highest Bid Expiration Date and returned to the Next Highest Bidder within five (5) Business Days thereafter or, if the Next Highest Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Next Highest Bidder in accordance with the terms of the Back-Up Bid.  The Minimum Deposits of Qualified Bidders not selected as either the Successful Bidder or Next Highest Bidder shall be returned to such bidders within five (5) Business Days of the date of the approval by the Court of the Successful Bidder and the Next Highest Bidder. The Minimum Deposit of the Successful Bidder will be dealt with in accordance with the terms of the Successful Bid.

l. <u>Reservation of Rights.</u>  The Debtors reserve the right to seek approval of one or more Asset Sales of portions of the Assets through separate Purchase Agreements with different purchasers in the event that the combination of such Asset Sales is determined by the Debtors to obtain the highest value for the Assets.  The Debtors further reserve the right as they may reasonably determine to be in the best interests of their estates to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Sale Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) remove some or all of the Assets from the Auction(s); (vi) enter into one or more Stalking Horse Agreements as described herein; (vii) waive terms and conditions set forth in these Sale Procedures with respect to all potential bidders; (viii) impose additional terms and conditions with respect to all potential bidders; (ix) extend the deadlines set forth herein; (x) adjourn or cancel the Auction(s) and/or Sale Hearing in open court without further notice; and (xi) modify the Sale Procedures as they may determine to be in the best interests of their estates or to withdraw this Motion at any time with or without prejudice.

m. The Debtors may, in consultation with the Committee, announce at the Auction additional procedural rules (*e.g.*, the amount of any required incremental overbids, the requirement that parties submit "best and final" bids, and conducting an open cry auction, one or more rounds of sealed bidding, or any combination of the foregoing) for conducting the Auction or otherwise modify these Sale Procedures; provided that such rules (1) are not materially inconsistent with these Sale Procedures, the Bankruptcy Code, or applicable orders of the Bankruptcy Court, and (2) are disclosed to each Qualified Bidder during the Auction.

The Debtors believe that conducting the Asset Sales as soon as possible is in the best interests of creditors because it will reduce unnecessary administrative expense and generate the highest possible net recovery for the estates.[3]  Over time, software and other similar assets can

---

[3]     To the extent there remain unsold Assets, the Debtors will evaluate whether it is in the best interest of creditors to attempt to sell the Assets again or abandon any unsold Assets, and the Debtors will seek Court approval as necessary.

become less valuable as code is not maintained and upgraded to maintain compatibility with other applications and interfaces. The Debtors respectfully submit that the timeline set forth above is reasonable and necessary under the circumstances of these Chapter 11 Cases to maximize the value of the Assets. Such timeline provides an approximately 26-day period between the filing of the Motion and the Bid Deadline. This timeline will allow potential bidders sufficient time to formulate bids for the Assets. Relevant information regarding the Debtors' business has been made available in the VDR, allowing potential bidders (subject to the execution of an NDA) to immediately conduct due diligence on the Assets.

### E. Stalking Horse Agreement

To date, the Debtors have not identified a "stalking horse" purchaser, but the Debtors continue to engage with potential bidders to determine whether it is within the Debtors' business judgment to enter into a Stalking Horse Agreement. To the extent the Debtors enter into a Stalking Horse Agreement, the Debtors believe that such a Stalking Horse Agreement would provide value to the Debtors' estates by locking in a bidder at a fair price while leaving open the ability to increase recoveries through competitive bidding and inducing other bidders to submit higher or better offers for the Assets. In the event that, prior to the Bid Deadline, the Debtors are able to identify a bidder and enter into a Stalking Horse Agreement, the Debtors, by this Motion, seek approval of the Bid Protections in the form of a break-up fee of no more than three percent (3%) of the purchase price and an expense reimbursement not to exceed $50,000.

### F. The Debtors' Secured Debt

As discussed in the First Day Declaration, the Debtors' sole secured debt is held by Ally Bank ("Ally"), which has a lien on substantially all of the Debtors' assets (the "Collateral"). As of the Petition Date, after offsetting existing credits against outstanding obligations, the Debtors had no payments due to Ally. However, Ally has contended that the Debtors have continuing unliquidated and contingent obligations (the "Contingent Obligations") to Ally of $976,389.04. In order to adequately protect Ally's lien, the Debtors agreed to maintain a segregated account that initially contained $976,389.04 (that is, the full amount of Ally's asserted Contingent Obligations), which the Debtors funded after the commencement of the wholesale sales of their vehicle inventory

(the "<u>Segregated Account</u>").  The Debtors are unaware of any other secured obligations in connection with the Assets.  The Debtors further believe that, after satisfaction of the Contingent Obligations, the Debtors will have sufficient cash and other assets to pay all priority and administrative claims and to provide for a small distribution to unsecured creditors.

## IV.  <u>ARGUMENT</u>

### A.  <u>Sale of the Assets Through the Sale Procedures Is Appropriate Under Section 363 and Will Maximize Value.</u>

In accordance with Bankruptcy Rule 6004(f), sales of property outside of the ordinary course of business may be conducted by private sale or public auction.  The Debtors have determined that the sale of their Assets utilizing the proposed Sale Procedures will enable them to obtain the highest or otherwise best prices for these Assets in the most efficient, cost-effective manner (thereby maximizing the value of the estates) and that the Asset Sales are in the best interests of the Debtors' creditors.

Section 363(b)(1) of the Bankruptcy Code provides: "the Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

Section 363 does not provide a standard for approving a sale, but the "bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification."  *In re Walter*, 83 B.R. 14, 16 (9th Cir. 1988); *see also In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986).  In determining whether the debtor-in-possession has complied with the sound business judgment rule, the Court must consider whether: (a) there has been "[a]ny improper or bad motive," (b) the "price is fair and the negotiations or bidding has occurred at arm's length" and (c) the sale followed "[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest."  *In re Castre*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).  When applying the rule, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an

informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) (considering the rule in the context of the debtor's decision to reject a contract).

The proposed sale of the Assets through the Sale Procedures reflects the Debtors' sound business judgment. The Assets consist of multiple different types of intellectual and other intangible property related to the Debtors' business. The Debtors have relied on the expertise of their management, Hilco Streambank, and their other professionals in marketing the Assets and devising the Sale Procedures and believe that the Sale Procedures described herein present the best opportunity for a timely liquidation of the Assets that will also yield the most proceeds. The Debtors believe that the Sale Procedures establish the parameters under which the value of the Assets will be tested in a bidding process through the ensuing Sale Hearing. Such procedures will increase the likelihood that the Debtors' creditors will receive the greatest possible consideration for their assets because they will ensure a competitive and fair bidding process. They also allow the Debtors to undertake an auction in as expeditious and efficient manner as possible, which the Debtors believe is essential to maximizing the value of the Debtors' estates for their creditors.

The Debtors also believe that the proposed Sale Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtors' assets. In particular, the proposed Sale Procedures will allow the Debtors to conduct an auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. Further, the Sale Procedures provide the Debtors with the opportunity to consider all Qualified Bids and to select, in their reasonable business judgment, and after consultation with their legal and financial advisors, as well as the counsel to the Committee, the highest and best offer(s) for the Assets. Moreover, the Sale Procedures provide the Debtors with the flexibility to modify the Sale Procedures, if necessary, to maximize value for the Debtors' estates.

Therefore, the Debtors submit that the proposed Asset Sales through the Sale Procedures will maximize the value of the Assets. For these reasons, the Debtors have satisfied the requirements of section 363(b).

## B.    A Sale Free and Clear Under Section 363(f) Is Warranted.

The Debtors may sell property free and clear of any interest in such property of an entity other than the estate under certain circumstances.  *See* 11 U.S.C. § 363(f)(1)-(5).  The only known holder of any liens on the Debtors' Assets is Ally, whose Contingent Obligations are oversecured and adequately protected by the Segregated Account.

A sale free and clear of liens, claims, encumbrances, or interests is necessary to maximize the value of the Debtors' assets.  A sale of the Assets other than one free and clear of all liens, claims, encumbrances, or interests would yield substantially less value for the Debtors' estates.  A sale free and clear of liens, claims, encumbrances, or interests is particularly appropriate under the circumstances, because any lien, claim, encumbrance, or interest in, to or against the Debtors' right, interest and title in the Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of liens, claims, encumbrances, or interests, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their liens, claims, encumbrances, or interests.

## C.    The Debtors Will Demonstrate at the Sale Hearing that the Successful Bidder Is Entitled to the Protections of Bankruptcy Code Sections 363(m) and (n)

As will be set forth in further detail at the Sale Hearing, the Debtors also maintain that the Successful Bidder is entitled to the protections afforded by Bankruptcy Code sections 363(m) and (n).

Specifically, Bankruptcy Code section 363(m) provides that:

[T]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), has held that:

> the requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

As the Debtors will demonstrate at the Sale Hearing, over the weeks leading up to the Sale Hearing, the Debtors will have spent a considerable amount of time and resources negotiating the proposed asset purchase agreement(s) at arm's length, with give and take on both sides. Under the circumstances, this Court should find that the Successful Bidder is entitled to all of the protections of Bankruptcy Code section 363(m).

In addition, as will be set forth in further detail at the Sale Hearing, the Sale has been negotiated, proposed, and entered into without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor, as will be demonstrated at the Sale Hearing, any Successful Bidder, have engaged in any conduct that would cause or permit the proposed asset purchase agreement to be avoided under Bankruptcy Code section 363(n).

**D.** **Provision for Bid Protection in the Form of a Break-Up Fee and Expense Reimbursement Has Become a Recognized and Necessary Practice**

The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and provide a benefit to the Debtors' estates

and creditors. In the event that the Debtors enter into one or more Stalking Horse Agreements prior to the Bid Deadline, the Debtors may seek approval at the Sale Hearing of Bid Protections for any Stalking Horse Agreement, with respect to which the prospective purchaser is not an insider of the Debtors, of a break-up fee of no more than three percent (3%) of the purchase price of such Stalking Horse Agreement and an expense reimbursement not to exceed $50,000. The Sale Procedures and, in particular, the proposed Bid Protections, are reasonable and supported by applicable case law.

The use of bid protections such as these has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. Historically, bankruptcy courts have approved bidding incentives (including bid protections) solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g.*, *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a "white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) ("bidding incentives are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). *See also In re Integrated Res.*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. at 662.

The Bid Protections proposed by the Debtors are consistent with the "business judgment rule" and constitute an administrative expense. To the extent the Debtors enter into a Stalking Horse Agreement, such Stalking Horse Agreement will serve as a minimum or floor bid for other bidders. The Bid Protections proposed by the Debtors should be approved as fair and reasonable.

1   The proposed Bid Protections are reasonable and well within the range of bidding protections

2   typically approved by bankruptcy courts, which fall within the range of 2-5% of the purchase price.

3   *See, e.g.*, *In re Verity Health Sys. Of Cal., Inc.*, Case No. 2:18-bk-20151-ER (Bankr. C.D. Cal.,

4   Apr. 1, 2020) [Docket No. 4398] (approving break-up fee equal to 2.78% of purchase price); *In re*

5   *Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del., Feb. 11, 2015) (court approved break-

6   up fee, which, together with expense reimbursement, was 4.3% of the purchase price under stalking

7   horse agreement); *In re Point Blank Solutions, Inc.*, Case No. 10-11255 (PJW) (Bankr. D. Del.

8   Oct. 5, 2011) (court approved break-up and expense reimbursement of 3.75% or $750,000 in

9   connection with sale of debtor's assets for purchase price of $20,000,000); *In re CXM, Inc.*, 307

10  B.R. 94, 103-04 (Bankr. N.D. Ill. 2004) (court approved break-up fee in amount equal to the actual

11  expenses that the stalking horse incurred in connection with its bid to buy the Sale Assets, subject

12  to a maximum cap of $200,000, which equaled 3% of the cash purchase price of $5,914,000).

13        Therefore, the Debtors' payment of the Bid Protections (*i.e.*, a break-up fee for a Stalking

14  Horse Agreement for a non-insider bidder of no more than three percent (3%) of the purchase price

15  of such Stalking Horse Agreement and an expense reimbursement not to exceed $50,000) under

16  the conditions set forth in this Motion is (a) an actual and necessary cost of preserving the Debtors'

17  estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to

18  the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and appropriate,

19  and (d) necessary to ensure that a stalking horse purchaser will continue to pursue the proposed

20  agreement to undertake the sale of the Assets, and therefore constitute administrative expenses with

21  priority pursuant to Bankruptcy Code section 503(b).

22  **V.      REQUEST FOR BANKRUPTCY RULE 6004 WAIVER**

23        By this Motion, the Debtors seek a waiver of any stay of the effectiveness of the Sale Order

24  pursuant to Bankruptcy Rule 6004(h).  The Debtors anticipate that time will be of the essence with

25  respect to any agreement to purchase the Assets, and postponement of the closing of the Asset Sales

26  may reduce recoveries to the Debtors' estates and creditors.  Therefore, absent waiver of any stay

27  of the effectiveness of the Sale Order, there is likely to be harm to the Debtors' estate and creditors.

28

## VI. <u>NOTICE</u>

Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets.

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Tracy Hope Davis, Esq. and Jason Blumberg, Esq.); (ii) the Debtors' secured lender Ally Bank; (iii) counsel for the Committee, (iv) all creditors, and (v) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. Based on the nature of the relief requested herein, the Debtors respectfully submit that notice is appropriate and no further notice is required.

## VII. <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, and for such other and further relief.

Dated: December 28, 2023                    **KELLER BENVENUTTI KIM LLP**


By: */s/ Thomas B. Rupp*
     Thomas B. Rupp
     *Attorneys for Debtors and Debtors*
     *in Possession*