**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
THOMAS B. RUPP (Cal. Bar No. 278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>SHIFT TECHNOLOGIES, INC., *et al.*,[1]<br><br>Debtors. | Case No. 23-30687 (HLB) (Lead Case)<br><br>(Jointly Administered)<br><br>**DECLARATION OF DAVID PERESS REGARDING SALE OF DEBTORS' INTELLECTUAL PROPERTY AND RELATED ASSETS**<br><br>[Related to Dkt. No. 366] |

---

[1] The last four digits of Shift Technologies, Inc.'s tax identification number are 5852. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Shift. The Debtors' service address is P.O. Box 1664, San Bruno, CA 94066-1664.

I, David Peress, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am Executive Vice President of Hilco IP Services, LLC d/b/a Hilco Streambank ("Hilco Streambank"), an intangible asset advisory firm based in New York, New York, with offices in Massachusetts and the United Kingdom. Hilco Streambank has extensive experience in, and a reputation for, providing high quality intellectual property disposition services to large and complex companies in bankruptcy proceedings and other distressed situations. Hilco Streambank and its principals have coordinated the marketing and sale of intellectual property assets for numerous companies in the United States and globally. As part of those engagements, Hilco Streambank was responsible for, among other things, marketing intangible assets, identifying and negotiating terms with potential stalking horse bidders, identifying potential buyers, conducting bidding auctions, and negotiating the terms of sales.

2. Hilco Streambank is the intellectual property advisor to Shift Technologies, Inc. and certain of its affiliates that are the debtors and debtors in possession (collectively, "Shift," the "Debtors," or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3. I have personally led the marketing and sale of intellectual property assets in a variety of bankruptcy cases in multiple jurisdictions, including in California. In those cases, I was responsible for the marketing and sale of intangible assets on behalf of debtors and trustees, including valuable software, domain names, trademarks, patents, copyrights, customer lists and related data, archival materials, and related assets. I have over thirty years of experience advising financially distressed companies, their creditors, equity holders, and other stakeholders. I have enabled estates and creditors to obtain the highest value for the debtor's intellectual property and associated tangible assets in a variety of cases and contexts.

4. I submit this declaration (the "Declaration") in support of the relief requested in the Debtors' *Motion of The Debtors For Entry Of An Order Pursuant to 11 U.S.C. §§ 105(a), 363(b),*

*and 363(f), And Fed. R. Bankr. P. 6004 (I) (A) Approving Sale Procedures; (B) Authorizing Entry into One or More Stalking Horse Agreements; and (C) Setting Sale Hearing; and (II) Authorizing Debtors To Sell Intellectual Property and Related Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* filed on December 28, 2023 [Dkt. No. 30] (the "Sale Motion")[2] seeking, among other things, approval of the Asset Sales.

5. Except as otherwise stated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, including other members of Hilco Streambank, and my personal knowledge and experience.

**Hilco Streambank's Marketing Efforts**

**in Furtherance of Maximizing Value of the Assets**

6. In connection with its engagement by the Debtors, Hilco Streambank worked with the Debtors and their professionals to identify and assemble relevant data concerning the Assets, and to market the Assets to potential buyers. Hilco Streambank's activities included:

a. Working with the Debtors and their advisors to identify, collect, and secure all of the available information and data concerning the Assets;

b. Developing marketing materials, including an information sheet and website landing page (the "Teaser"), and a detailed information memorandum (the "CIM"), which described the Assets, the history of their use and their availability for sale;

c. Working with the Debtors to secure credentials for assets including social media pages and domain names;

d. Synthesizing information concerning the Debtors' Assets;

---

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the Sale Motion.

e. Drafting and disseminating a press release via *PR Newswire* describing the Assets and their availability for sale;

f. Coordinating an exclusive feature in the trade publication *Automotive News* describing the Assets and their availability for sale;

g. Developing a contact list of potential buyers of the Assets;

h. Having direct contact by phone or email with approximately 197 potential buyers of the Assets;

i. Disseminating email marketing materials that were sent to approximately 31,000 contacts from Hilco Streambank's proprietary contact database;

j. Advertising the Assets on Hilco Streambank's LinkedIn and Twitter pages;

k. Establishing and populating a virtual data room (the "VDR") and arranging for the admission of approximately 40 parties to the VDR who executed a form of non-disclosure agreement acceptable to the Debtors;

l. Soliciting "stalking horse" proposals, identifying a stalking horse bidder, and assisting the Debtors and their counsel in negotiating and documenting the Stalking Horse Bid (defined below);

m. Developing an auction format for the Assets, including a bid form and bidder qualification guidelines (the "Bid Qualification Form");

n. Managing the Auction of the Assets;

o. Working with the Debtors and the Successful Bidders (defined below) of the Assets to document deliverables and terms of the Asset Sales; and

p. Continuing to work with the Debtors and their professionals to close the Asset Sales.

**Designation of the Stalking Horse Bid**

**Subject to Court Approval**

7. The Teaser and CIM advertised the opportunity to serve as a "stalking horse" bidder. In discussions that I and my team members had with interested parties, we also indicated to parties expressing interest that the Debtors were interested in developing a lead bidder that could act as a "stalking horse" to commence an auction of the Assets. After discussions with multiple potential bidders, one party submitted a written indication of interest at a valuation which merited consideration as a stalking horse.

8. Following deliberations among Hilco Streambank, the Debtors, their advisors, and the Committee regarding the terms of a stalking horse bid, on February 1, 2024, Now Presence, LLC (the "<u>Stalking Horse Bidder</u>") signed a stalking horse agreement (the "<u>Stalking Horse Bid</u>") for the sale of certain of the Assets, including the Domain Names, the Social Media Accounts, the Books and Records, and all goodwill associated with the Acquired Assets (each capitalized term as defined in the Stalking Horse Bid) (the "<u>Stalking Horse Assets</u>"), subject to higher and/or otherwise better offers and subject to Court approval. The aggregate consideration set forth in the Stalking Horse Bid was $1,000,000. On February 1, 2024, Hilco Streambank received a deposit from the Stalking Horse Bidder in the amount of $100,000, representing ten percent (10%) of the amount of the Stalking Horse Bid. That same day, the Debtors filed the *Notice of Debtor's Entry into Stalking Horse Agreement for Sale of Domain Name Assets and Social Media Account* [Docket No. 416], and immediately thereafter, Hilco Streambank posted a copy of such notice and the Stalking Horse Bid into the VDR and advised interested parties of the Stalking Horse Bid. A copy of the executed asset purchase agreement with the Stalking Horse Bidder is attached hereto as **Exhibit A**.

9. As a key inducement to the Stalking Horse Bidder's entry into the Stalking Horse Bid, the Debtors agreed, subject to Court approval, to provide the Stalking Horse Bidder with a

break-up fee in the total amount of $30,000 (the "Break-Up Fee"), should the Debtors consummate an alternative transaction for the Stalking Horse Assets with another bidder, such Break-Up Fee representing 3% of the purchase price contemplated under the Stalking Horse Bid. Based on numerous discussions and negotiations with all of the interested parties, including the Stalking Horse Bidder, I do not believe that the Stalking Horse Bidder would have agreed to serve as a stalking horse at the value reflected in the Stalking Horse Bid absent the Break-Up Fee. In fact, the consideration offered by the Stalking Horse Bid exceeded by 40% the highest indications of interest that had been provided to me and my team prior to the entry into the Stalking Horse Bid.

10. In addition to creating an initial floor at an acceptable valuation, the Stalking Horse Bid contained terms and conditions that were agreeable to the Debtors, creating a market-based form of agreement that other bidders could adopt. As the Auction developed, it was clear that entry into the Stalking Horse Bid signaled to the market the desirability of the Stalking Horse Assets at values substantially higher than those that had been previously proposed. In that regard, parties came to the Auction with expectations appropriately scaled both in terms of value and form of transaction by enabling the Debtors to provide a baseline bid for the Stalking Horse Assets.

11. Based on my substantial experience in managing auction sales of intellectual property assets similar to the Assets and my personal knowledge of the Debtors' sale and marketing efforts, in my opinion the agreement to pay the Break-Up Fee is fair and reasonable and in the best interests of the Debtors' estates and its creditors.

12. In addition, I believe that the Break-Up Fee was designed to encourage, and in fact encouraged, bidding that culminated in an appreciably higher value for the Acquired Assets. On the basis of numerous discussions with interested parties over the course of more than approximately eight weeks of solicitation, I submit that the value of the Acquired Assets was maximized by the selection of the Stalking Horse Bidder, which enabled the Debtors to provide a

baseline bid against which all other potential bidders may bid for the Stalking Horse Assets. Prior to entry into the Stalking Horse Bid, the Debtors' discussions with potential bidders included indications of interest for the Stalking Horse Assets at lower valuation ranges than the Stalking Horse Bid. Accordingly, I believe that the Stalking Horse Bid, including the Break-Up Fee, was critical to yielding the best price for the Assets.

13. As such, it is my opinion, based on my extensive experience managing similar sale processes of intellectual property assets, that the Debtors' payment of the Break-Up Fee under the conditions set forth in the Stalking Horse Bid, the Motion and this Order is (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and appropriate, and (d) necessary to ensure that Buyer will continue to pursue the proposed Agreement to undertake the sale of the Assets.

### Further Marketing Efforts to Generate an Auction

14. Hilco Streambank and the Debtors notified potential buyers that any offers to acquire the Assets were required to be submitted in writing on or before February 1, 2024 (the "Bid Deadline"), together with a good-faith deposit equal to ten percent (10%) of the amount of the potential buyer's bid, along with the other requirements as set forth in the Sale Motion. As a result of the Stalking Horse Bid, to qualify as a bidder for the Stalking Horse Assets at the Auction, the Debtors set a minimum bid for all the Stalking Horse Assets of $1,050,000, reflecting the consideration set forth in the Stalking Horse Bid, plus the Break-Up Fee, plus a $20,000 initial overbid. For parties bidding on Assets other than the Stalking Horse Assets—namely codebases enabling the Debtors' technology solutions and legacy codebases from previous acquisitions and U.S. Patent No. 10664808—the Debtors set no minimum bid to participate.

15. Ultimately, the Debtors received bids from ten (10) interested parties. I and my team, along with the Debtors and their counsel, worked to qualify the bids received from these interested parties. As a result of those efforts, and after consultation with the Committee, the bids of five (5) bidders were deemed qualified as contemplated by the Sale Procedures (the "<u>Qualified Bidders</u>").

16. Each of the Qualified Bidders executed and delivered to the Debtors a Bid Qualification Form including the following affirmative statements[3] in accordance with the requirements to be deemed a Qualified Bidder contained in the Sale Procedures:

   a. This Bid is irrevocable, as described herein at Section (3)(b);

   b. This Bid contains no contingencies, as described herein at Section (3)(d);

   c. This Bid is submitted in good faith, and I have not engaged in any collusion, as described herein at Section (3)(h);

   d. I have and will continue to comply with the Sale Procedures, as described herein at Section (3)(h);

   e. I am not entitled to any break-up, termination, or similar fee or payment (unless designated as a "stalking horse" bidder), as described herein at Section (3)(h); and

   f. I waive any substantial contribution claims related to this Bid, as described herein at Section (3)(h);

   g. I consent to the exclusive jurisdiction of the Bankruptcy Court with respect to all matters related to this Bid, as described herein at Section (3)(i).

---

[3] Capitalized terms and reference to sections contained in this paragraph 16 only refer to the Bid Qualification Form contained in the VDR and made available to all interested parties under NDA.

**The Auction for the Stalking Horse Assets**

**Generated Substantial Value for the Estates**

17. On February 5, 2024, the Debtors convened the Auction for the Stalking Horse Assets among the five (5) Qualified Bidders utilizing a video conferencing platform. Representatives of the Debtors and the Committee were also present.

18. After the submission of approximately 16 topping bids, the Debtors selected bids from three (3) separate Qualified Bidders as the Successful Bids for certain of the Stalking Horse Assets, comprising aggregate consideration to the Debtors of $2,300,000.00. The Assets subject to each respective bid, and the consideration for each, are summarized below, and more fully described in the purchase agreements of each Successful Bidder:

    a. Shift Technologies Inc., a British Columbia company ("Shift Canada"): $1,365,000.00 for the Shift.com domain name assets. A copy of the executed asset purchase agreement with Shift Canada is attached hereto as **Exhibit B**.

    b. Primera Management I, L.L.C., a Delaware limited liability company ("Primera"): $900,000.00 for the Fair.com domain name assets (the "Fair Assets").[4] A copy of the executed asset purchase agreement with Primera is attached hereto as **Exhibit C**.

    c. Scott Painter, an individual: $35,000.00 for the Carlotz.com and Autoacquire.com domain name assets, as well as drivecanvas.io and

---

[4] At the Auction, Primera submitted a $1,000,000.00 bid for the Fair Assets, which the Debtors, in consultation with the Committee, accepted as the Successful Bid on the record at the Auction. After the Auction, Primera raised certain issues with the Debtors relating to the assets in the lot that was the subject of its Successful Bid. The Debtors subsequently, in consultation with the Committee, agreed to accept a $900,000.00 offer for this lot from Primera as the Successful Bid for the Fair Assets.

xchangeleasing.com. A copy of the executed asset purchase agreement for these domain names with Mr. Painter is attached hereto as **Exhibit D**.

19. The Debtors requested that each Successful Bidder wire an additional deposit, if needed, in an amount sufficient to increase their initial deposit to 10% of the purchase price contemplated under each such Successful Bid, prior to the Sale Hearing. To the extent necessary, each Successful Bidder increased their deposit as instructed.

20. At the Auction for the Stalking Horse Assets, after consultation with their advisors, Hilco Streambank, and the Committee, the Debtors informed the Qualified Bidders that the Auction would be partially adjourned to February 9, 2024, at 9:00 a.m. Pacific Time, solely with respect to the Assets not contemplated under the Stalking Horse Bid or the Successful Bids—namely, the Debtors' codebases and U.S. Patent No. 10664808—as well as for Next Highest Bids for the Assets subject to the Successful Bids, and that any interested party may submit a further bid for such adjourned Assets by no later than February 8, 2024 at 12:00 p.m. Pacific Time (the "Codebase Bid Deadline"). The Debtors filed the *Notice of Adjournment of Auction for Certain Intellectual Property Assets* [Docket No. 366] indicating the same on February 5, 2024. Hilco Streambank provided such notice in the VDR on the same day.

### Designation of a Backup Bidder

21. In light of the results of the Auction for the Stalking Horse Assets, the Debtors, after consulting their advisors, Hilco Streambank, and the Committee, have determined to designate the Stalking Horse Bidder as the Backup Bidder with regard to the Stalking Horse Assets, which Stalking Horse Bid was submitted in the amount of $1,000,000.00. I believe that this designation of the Backup Bidder will provide benefit to the Debtors and their estates in that the designation of the Backup Bidder will serve as a backstop against any execution risk with regard to the closing of the Asset Sales contemplated under the Successful Bids.

**The Bids for the Adjourned Assets Generated**

**Additional Substantial Value for the Estates**

22. Following the adjournment of the Auction, the Debtors received two (2) bids for the codebase-related Assets by the Codebase Bid Deadline. One (1) bid was deemed a Qualified Bid, as summarized below (the "Painter Codebase Bid"):

   a. Scott Painter, an individual: $120,000.00 for, among other things, the Shift Technologies codebase (the "Codebase – Shift Platform"), the legacy Fair Technologies codebase (the "Codebase – Legacy Fair Platform") each as more fully described in the Painter Codebase Bid, and the books and records supporting the Assets subject to the Painter Codebase Bid. A copy of the executed asset purchase agreement for the codebases with Mr. Painter is attached hereto as **Exhibit E**.

23. No additional bids were received from Qualified Bidders with regard to either of the Codebase – Legacy Fair Platform or the Codebase – Shift Platform. In light of this, and after consulting with its advisors, Hilco Streambank, and the Committee, the Debtors decided to cancel the adjourned Auction and to designate Scott Painter as the Successful Bidder for the Codebase – Legacy Fair Platform and the Codebase – Shift Platform.

**Conclusion**

24. I believe that each of the Asset Sales described above were negotiated, proposed, and entered into by the Debtors and the Successful Bidders without collusion and in good faith, and resulted from arm's length bargaining positions. Moreover, to the best of my knowledge, no common identity of directors or controlling shareholders exists between the Debtors and the Successful Bidders.

25. The Sale Hearing to consider entry of an order approving the Sale Motion is scheduled before the Court on February 22, 2024. At the Sale Hearing, the Debtors will seek approval of the Asset Sales to the Successful Bidders, and the payment of the Break-Up Fee to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Bid.

26. The Successful Bids, in the aggregate amount of $2,420,000.00 represent the highest and best offers available for the Assets after the reasonable and thorough marketing process conducted by Hilco Streambank and the Debtors. The sale process was fulsome and robust, and generated a competitive auction. Further marketing of the Assets is unlikely to generate additional value. Moreover, the Debtors' designation of the Stalking Horse Bid was appropriate and maximized value, and the payment of the Break-Up Fee to the Stalking Horse Bidder is appropriate. I also believe that the designation of the Backup Bidder is appropriate to create a backstop against any execution risk related to the closing of any of the Asset Sales described herein. Accordingly, in my opinion, granting the relief requested in the Sale Motion is in the best interests of the Debtors' estates and creditors.

*[Remainder of page intentionally blank]*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ninth day of February, 2024, in Quincy, Massachusetts.

*/s/ David Peress*

David Peress