**EXHIBIT C**

**(Primera APA)**

## INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT

This Intellectual Property Asset Purchase Agreement ("Agreement") is made as of February 9, 2024 ("Effective Date"), by and between Primera Management I, L.L.C., a Delaware limited liability company ("Buyer"), and Shift Technologies, Inc., a Delaware corporation, and each of its undersigned affiliated debtors in the Bankruptcy Cases (as defined below), to the extent such affiliated debtor owns any of the Acquired Assets (each, a "Seller," and collectively, the "Sellers"). Capitalized terms used herein and not otherwise defined herein have the respective meanings ascribed to them in Article I.

## RECITALS

A.      On October 9, 2023 (the "Petition Date"), each of the Sellers filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") under Case No. 23-30687 (HLB) (Lead Case - Jointly Administered) (the "Bankruptcy Cases"). Sellers continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      On December 28, 2023, Sellers filed the *Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 363(f), and Fed. R. Bankr. P. 6004 (I) (a) Approving Sale Procedures; (b) Authorizing Entry into One or More Stalking Horse Agreements; and (c) Setting Sale Hearing; and (II) Authorizing Debtors to Sell Intellectual Property and Related Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* (the "Sale Procedures Motion").

C.      On January 18, 2024, the Bankruptcy Court issued the *Order Regarding Sale Procedures Motion* (the "Sale Procedures Order"), a copy of which is attached hereto as <u>Exhibit A</u>, which authorized the Debtors to sell the Acquired Assets in accordance with the procedures set forth in the Motion, subject to the provisions of the Sale Procedures Order (the "Sale Procedures").

D.      The Sale Procedures Order established a deadline for Sellers to receive qualified bids for the Acquired Assets and a date for the commencement of an auction, if necessary. The Sale Procedures Order also provides that by February 9, 2024, Sellers will file with the Bankruptcy Court (i) declaration(s) in support of the sale of the Acquired Assets, which will include a copy of this Agreement, and (ii) a notice of the hearing for the Bankruptcy Court to consider final approval of the sale(s) of the Acquired Assets, scheduled to take place by videoconference on February 22, 2024, at 10:00 a.m. (Pacific Time), which will identify the Buyer(s), the Acquired Assets, and the [respective] Purchase Price[s] for the Acquired Assets. Sellers will request that upon approval of the sale(s), the Bankruptcy Court issue an *Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 363(f), and Fed. R. Bankr. P. 6004 Approving Sale of Intellectual Property and Related Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* (the "Sale Order"), substantially in the form of the attached <u>Exhibit B</u>.

E.      Sellers desire to sell to Buyer(s) all of the Acquired Assets, and Buyer desires to purchase from Sellers the designated Acquired Assets, on the terms and subject to the conditions hereinafter set forth.

F.    Pursuant to the Sale Procedures, Buyer has delivered to Hilco Streambank, in immediately available funds, an amount equal to ten percent (10%) (the "Deposit") of the Purchase Price.

G.    The execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order.

H.    The Parties desire to consummate the proposed transactions as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.    For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Affiliate" has the meaning ascribed to it in section 101(2) of the Bankruptcy Code. Sellers and Buyer agree that Buyer is not an Affiliate of any of the Sellers.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 7.1(e).

"Alternative Transaction" means a transaction or series of related transactions (whether by asset sale, equity purchase, reorganization, merger, or otherwise) pursuant to which Sellers agree to a sale or sales (to one or more Persons other than Buyer) of all of the Acquired Assets or any group of assets that includes all or any material portion of the Acquired Assets or a reorganization of Sellers pursuant to a plan approved the Bankruptcy Court.

"Auction" has the meaning ascribed to such term in the Sale Procedures.

"Next Highest Bidder" has the meaning ascribed to such term in the Sale Procedures.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

Case: 23-30687    Doc# 445-3    Filed: 02/09/24    Entered: 02/09/24 22:34:49    Page 3 of 32

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in San Francisco, California, are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Termination Notice" has the meaning set forth in Section 10.1(c)(i).

"Closing" has the meaning set forth in Section 3.4.

"Closing Date" has the meaning set forth in Section 3.4.

"Closing Date Cash Payment" has the meaning set forth in Section 3.3.

"Closing Legal Impediment" has the meaning set forth in Section 8.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bids" has the meaning set forth in Section 6.2(a).

"Deposit" has the meaning set forth in the Recitals.

"Domain Names" means the Internet resource names and associated uniform resource locaters of Sellers that are owned by Sellers and set forth on Schedule 1.3.

"Effective Date" has the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, interest, claim, mortgage, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind including, but not limited to, claims of successor liability.

"Governmental Authority" means any United States federal, state, municipal, or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, including the United States Patent and Trademark Office, or any court, tribunal, or judicial body of competent jurisdiction, including the Bankruptcy Court.

"Hilco Streambank" means Hilco IP Services, LLC, d/b/a Hilco Streambank.

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of Ayman Moussa (CEO, Shift Technologies, Inc.) and Scott Hodgdon (General Counsel and Corporate Secretary, Shift Technologies, Inc.).

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction, or decree by any Governmental Authority.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability, or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any effect, change, condition, circumstance, development, or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on (x) the Acquired Assets, taken as a whole or (y) Sellers' ability to consummate the transactions provided for herein, excluding any effect, change, condition, circumstance, development, or event that results from or arises out of: (i) general business or economic conditions in any of the geographical areas in which any Seller operates or uses the Acquired Assets; (ii) geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war or any effect, change or event that is otherwise generally applicable to the industries and markets in which any Seller operates; (iii) changes in Laws or accounting regulations or principles; (iv) any event, change, or occurrence, affecting United States financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any calamity or force majeure event, including but not limited to the COVID-19 pandemic or any other pandemic (including the impact on economies generally and the results of any actions taken by any Governmental Authority in response thereto); (vi) the Bankruptcy Cases, including, without limitation, the Auction and any announced liquidation of Sellers' assets; or (vii) any action expressly provided for in this Agreement or taken at the written request of Buyer; except in the case of clauses (i) through (v), to the extent such change, condition, circumstance, development, or event has a disproportionate impact on the Acquired Assets, as compared to the impact on other participants engaged in the industries and geographies in which Sellers operate.

"Order" means any award, writ, injunction, judgment, order, or decree entered, issued, made, or rendered by any Governmental Authority.

"Outside Date" has the meaning set forth in Section 10.1(b)(ii).

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and Sellers.

"Patent" means the patent set forth on <u>Schedule 1.4</u>.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, other entity, or Governmental Authority.

"Post-Closing Tax Period" means (a) any taxable period beginning after the Closing Date and (b) the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Covenant" has the meaning set forth in Section 11.9.

"Pre-Closing Tax Period" means (a) any taxable period ending on or before the Closing Date and (b) the portion of any Straddle Period beginning on the first day of such Straddle Period and ending at the close of business on the Closing Date.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" has the meaning set forth in the Sale Procedures.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Sale Motion" has the meaning set forth in the Recitals.

"Sale Order" has the meaning set forth in the Recitals.

"Sale Procedures" means the solicitation, bid, and auction procedures governing the sale of the Acquired Assets, as set forth in the Sale Procedures Motion but subject to the provisions of the Sale Procedures Order.

"Sale Procedures Order" has the meaning set forth in the Recitals.

"Sellers" has the meaning set forth in the Preamble.

"Sellers Termination Notice" has the meaning set forth in Section 10.1(d)(i).

"Social Media Accounts" means the online account registrations of Sellers described in Schedule 1.5.

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" has the meaning set forth in the Sale Procedures.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, *ad valorem*, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated, or other tax or imposition, including any interest, penalty, or addition thereto.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority or required to be provided to any Person, in each case in connection with the determination, assessment, or collection of any Tax or the administration of any laws, regulations, or administrative requirements relating to any Tax.

"Third Party" means a Person who is neither a Party nor an Affiliate of a Party.

"Trademarks" means the trademarks, service marks, trade names, logos, slogans, designs, common law trademarks and service marks, and trademark and service mark registrations therefor that are owned by Sellers and are set forth in <u>Schedule 1.6</u>.

"Transaction Documents" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 7.1(a).

Section 1.2    <u>Other Definitions and Interpretive Matters.</u>  Unless otherwise denoted to the contrary in this Agreement by the context or use thereof:

(a)    When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(b)    Any reference in this Agreement to "$" means U.S. dollars.

(c)    All Exhibits attached hereto or referred to herein are hereby incorporated into and made a part of this Agreement as if set forth in full herein.

(d)    Any reference in this Agreement to words importing the singular number also includes the plural and vice versa.

(e)    The provision of a table of contents, the division of this Agreement into Articles, Sections, and other subdivisions, and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(f)    Words such as "herein," "hereof," and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(g)    The word "including" or any variation thereof means "including, without limitation," and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of the Acquired Assets.</u> On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, in consideration of payment of the Purchase Price by Buyer, Sellers will sell, transfer, assign, convey, and deliver, or cause to be sold,

A024H

transferred, assigned, conveyed, and delivered, to Buyer, free and clear of any Encumbrances, and Buyer will purchase, assume, and accept from Sellers, all right, title, and interest of Sellers in, to, or under the following (collectively, the "Acquired Assets"):

> (a)     the Domain Names;
>
> (b)     the Social Media Accounts; and
>
> (c)     all goodwill associated with the Acquired Assets.

The term "Acquired Assets" excludes: (1) all assets not specifically defined herein as an Acquired Asset; and (2) all claims and causes of action belonging to the Sellers and not specifically sold and transferred to Buyer. Sellers and Buyer acknowledge and agree that Buyer will not assume any Liabilities of Sellers relating to the ownership, possession, or operation of the Acquired Assets prior to the Closing, and that such Liabilities will remain with the Sellers. Buyer will assume all Liabilities arising from the ownership, possession, or operation of the Acquired Assets by Buyer immediately after the Closing.

   **Section 2.2     Further Assurances.** Following the Closing, the Parties will use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things reasonably necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions provided for in this Agreement at or after the Closing; provided, however, that nothing in this Section 2.2 will prohibit Sellers from ceasing operations or winding up Sellers' affairs and liquidating following the Closing. Upon the completion of the winding up of Sellers' affairs and liquidation, Sellers will have no further responsibility under this Section 2.2.   In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets are not conveyed at Closing, Sellers will use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing.

## ARTICLE III

## PURCHASE PRICE; CLOSING

   **Section 3.1     Purchase Price.**  In consideration for the purchase, sale, assignment, and transfer of the Acquired Assets, Buyer will pay to Sellers in cash the sum of nine hundred thousand dollars ($900,000.00) (the "Purchase Price").

   **Section 3.2     Deposit.**   Buyer will deliver the Deposit to Hilco Streambank in immediately available funds in accordance with the terms of the Sale Procedures. The Deposit will not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Sellers or Buyer. The Deposit will be retained by Sellers at the Closing as a portion of the Purchase Price, or if this Agreement is terminated, treated in the manner set forth in Section 10.2.

   **Section 3.3     Closing Date Payment.**  At the Closing, (a) Buyer will pay to Sellers, or to an account designated in writing by Sellers, in cash by wire transfer of immediately available funds, an amount equal to the Purchase Price minus the Deposit (the "Closing Date Cash Payment"), and (b) Buyer and Sellers will direct Hilco Streambank to indefeasibly transfer the

Deposit, and Closing Date Cash Payment if Hilco Streambank is in receipt of such payment, to an account designated in writing by Sellers.

Section 3.4    Closing Date. On the terms and subject to the conditions set forth in this Agreement, the closing of the sale of the Acquired Assets provided for herein (the "Closing") will take place by electronic exchange of documents on a date no later than the first Business Day following the date on which the conditions set forth in Article VIII and Article IX have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Sellers may mutually agree upon in writing. The date and time at which the Closing actually occurs is referred to herein as the "Closing Date."

Section 3.5    Buyer's Deliveries to Sellers. At the Closing, Buyer will deliver to Sellers each of the following:

(a)    the Closing Date Cash Payment in accordance with Section 3.3(a), and a direction to Hilco Streambank, duly executed by Buyer, to deliver the Deposit, and the Closing Date Cash Payment if Hilco Streambank is in receipt of such payment, to Sellers in accordance with Section 3.3(b);

(b)    each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(c)    the certificates of Buyer to be received by Sellers pursuant to Section 9.1 and Section 9.2; and

(d)    such assignments in form reasonably satisfactory to Sellers as Sellers may reasonably request to transfer and assign the Acquired Assets to Buyer.

Section 3.6    Sellers' Deliveries to Buyer.  At the Closing, Sellers will deliver to Buyer each of the following:

(a)    a direction to Hilco Streambank, duly executed by Sellers, to deliver the Deposit, and the Closing Date Cash Payment if Hilco Streambank is in receipt of such payment, to Sellers in accordance with Section 3.3(b);

(b)    each other Transaction Document to which any Seller is a party, duly executed by each such Seller;

(c)    confirmation that the Bankruptcy Court has entered the Sale Order and no order staying, reversing, modifying, or materially amending the Sale Order will be in effect on the applicable Closing Date;

(d)    such assignments in form reasonably satisfactory to Buyer that are necessary to vest in Buyer all of Sellers' right, title, and interest in, to, or under all of the Acquired Assets, free and clear of Encumbrances; and

(e) with respect to the Domain Names and the Social Media Accounts, if an Acquired Asset or Acquired Assets, transfer to Buyer of all administrative rights to the Domain Names and the Social Media Accounts in a manner reasonably and mutually acceptable to Sellers and Buyer.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Buyer that the following statements contained in this Article IV are true and correct as of the date hereof and as of the Closing Date:

Section 4.1 <u>Organization and Good Standing.</u> Each of Shift Technologies, Inc. and Shift Operations LLC is an entity duly organized, validly existing, and in good standing under the Laws of the jurisdiction of such Seller's organization. Subject to the limitations imposed on such Seller as a result of the Bankruptcy Cases, (x) each such Seller has the requisite corporate power and authority to own or lease and to operate and use such Seller's properties, and (y) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires, or has required it, to qualify, except where the failure to be so qualified or have qualified would not reasonably be expected to have a Material Adverse Effect.

Section 4.2 <u>Authority; Validity; Consents.</u> Each Seller has, subject to requisite Bankruptcy Court approval and limitations imposed on Sellers as a result of the Bankruptcy Cases, as applicable, the requisite corporate power and authority necessary to enter into and perform such Seller's obligations under this Agreement and the other Transaction Documents to which such Seller is a party, and to consummate the transactions provided for herein and thereby. This Agreement has been duly and validly executed and delivered by such Seller and each other Transaction Document required to be executed and delivered by such Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to requisite Bankruptcy Court approval and limitations imposed on such Seller as a result of the Bankruptcy Cases, as applicable, this Agreement and the other Transaction Documents constitute, with respect to such Seller, the legal, valid, and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Sale Order), and except for (a) entry of the Sale Order, and (b) notices, filings, and consents required in connection with the Bankruptcy Cases, each Seller is not required to give any notice to, make any filing with, or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party, or the consummation or performance of any of the transactions provided for herein and thereby.

Section 4.3 [Reserved.]

Section 4.4 [Reserved.]

9

Section 4.5    Legal Proceedings. As of the date hereof, except for the Bankruptcy Cases, there is no Proceeding or order pending or, to Sellers' Knowledge, threatened in writing against any Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality, or validity of the transactions provided for herein, or (b) would have a Material Adverse Effect.

Section 4.6    Brokers or Finders. Except for Hilco Streambank, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment owed in connection with this Agreement, the other Transaction Documents to which any Seller is a party, or the transactions provided for herein or thereby, in all cases for which Buyer is or will become liable following the Closing.

Section 4.7    Free and Clear. Pursuant to the Sale Order, at Closing, Sellers' sale of the Acquired Assets to Buyer will be free and clear of all Encumbrances.

Section 4.8    "As-is, Where-is". Except for Sellers' representations and warranties in this Article IV, **THE SALE AND ASSIGNMENT OF THE ACQUIRED ASSETS PURSUANT TO THIS AGREEMENT IS MADE ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS**. Sellers expressly disclaim all other warranties of any kind, whether express or implied, including but not limited to the implied warranties of merchantability, fitness for a particular purpose, and non-infringement. Sellers have not made any, and make no other, express or implied representation or warranty, either oral or written, whether arising by law, course of dealing, course of performance, usage, trade, or otherwise, including with respect to the ownership or use of the Acquired Assets, all of which Sellers expressly disclaim.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that the following statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date:

Section 5.1    Organization and Good Standing. Buyer is a Delaware limited liability company, duly organized, validly existing, and in good standing under the laws of the jurisdiction of Buyer's organization. Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 5.2    Authority; Validity; Consents. Buyer has the requisite power and authority necessary to enter into and perform Buyer's obligations under this Agreement and the other Transaction Documents to which it is a party, and to consummate the transactions provided for herein and thereby. The execution, delivery, and performance of this Agreement by Buyer and the consummation by Buyer of the transactions provided for herein have been duly and validly authorized by all requisite corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer, and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles

Case: 23-30687    Doc# 445-3    Filed: 02/09/24    Entered: 02/09/24 22:34:49    Page 11 of 32

of equity. Subject to requisite Bankruptcy Court approval, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party, or the consummation or performance of any of the transactions provided for herein or thereby.

Section 5.3     No Conflict.  The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the organizational documents of Buyer, (c) any Order, or (d) any Law.

Section 5.4     Availability of Funds; Solvency. At the Closing, Buyer will have sufficient cash in immediately available funds to pay the Purchase Price and any other costs, fees, and expenses required to be paid by it under this Agreement and the other Transaction Documents. As of the Closing and immediately after consummating the transactions provided for in this Agreement and the other transactions provided for in the Transaction Documents, Buyer will not, assuming that the representations and warranties made by Sellers in Article IV of this Agreement are accurate in all material respects, (i) be insolvent (either because Buyer's financial condition is such that the sum of Buyer's debts is greater than the fair value of Buyer's assets, or because the present fair value of Buyer's assets will be less than the amount required to pay Buyer's probable Liability on Buyer's debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in Buyer's business, or (iii) have incurred or planned to incur debts beyond Buyer's ability to repay such debts as they become absolute and matured.

Section 5.5     Legal Proceedings.   There are no Proceedings pending or, to Buyer's knowledge, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents, or to consummate the transactions provided for herein or thereby.

Section 5.6     Buyer's Due Diligence and Investigation.  Prior to executing this Agreement: (i) Buyer conducted its own due diligence and an independent investigation and analysis of the Acquired Assets; (ii) except as specifically contained in this Agreement, Buyer did not rely upon anything stated or not stated by Sellers or any of their attorneys or other professionals in electing to purchase the Acquired Assets for the Purchase Price; and (iii) no employee, agent, or other representative of any Seller was authorized to make, and Buyer did not rely upon, any statement or representation other than those specifically contained in this Agreement. Buyer acknowledges and agrees that it relied upon the advice of independent counsel throughout its negotiations with Sellers. **Buyer acknowledges and agrees that, except for the representations and warranties contained in Article IV, Sellers are selling, assigning, and transferring the Acquired Assets to Buyer on an "as is," "where is," and "with all faults" basis.**

Section 5.7     Brokers or Finders. Buyer has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment owed in connection with this Agreement, the other Transaction Documents to which Buyer is a party, or the transactions provided for herein or thereby, in all cases for which Sellers are or will become liable following the Closing.

## ARTICLE VI

## ACTIONS PRIOR TO THE CLOSING DATE

Section 6.1    Actions Prior to the Closing Date. Sellers covenant and agree that, except (i) as expressly provided for in this Agreement, (ii) with the prior written consent of Buyer, which consent will not be unreasonably withheld, conditioned, or delayed, (iii) as required by the Bankruptcy Court, or (iv) as otherwise required by Law, after the Effective Date and prior to the Closing Date (or the earlier termination of this Agreement):

(a)        Sellers will use commercially reasonable efforts, taking into account Sellers' status as debtors-in-possession in the Bankruptcy Cases, to maintain and preserve the Acquired Assets in the Acquired Assets' present condition in all material respects;

(b)        Sellers will not:

(i)        sell, lease (as lessor), transfer, or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance on, any Acquired Asset;

(ii)        cancel or compromise any material Claim or waive or release any material right, in each case, that is a Claim or right related to an Acquired Asset; or

(iii)        enter into any agreement or commitment to take any action prohibited by this Section 6.1.

Section 6.2    Bankruptcy Court Filings and Approval.

(a)        This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of a sale or other disposition of the Acquired Assets (collectively, "Competing Bids"). From the Effective Date and until the Sellers have declared a Successful Bid pursuant to the Sale Procedures, Sellers are permitted to, and to cause its Representatives and Affiliates to, initiate communication with, and solicit or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any Alternative Transaction. In addition, Sellers have the authority to respond to any inquiries or offers with respect to an Alternative Transaction, and to perform any and all other acts related thereto to the extent any such act is not in violation of the Sale Procedures or the Bankruptcy Code.

(b)        Sellers will use commercially reasonable efforts to obtain the entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions provided for in this Agreement. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the entry of the Sale Order.

(c)        Next Highest Bidder.  By executing this Agreement, Buyer agrees to be the Next Highest Bidder in the event that Sellers select it as such in accordance with the Sale Procedures.

# ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1    Taxes.

(a)    Any sales, use, transfer, documentary, stamp, registration, recording, value added, or similar Taxes and fees (including any penalties and interest) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes"), along with any expenses arising in connection with preparation and filing of Tax Returns with respect to the Transfer Taxes, will be borne entirely by Buyer. Accordingly, if any Seller is required by Law to pay any such Transfer Taxes, Buyer will promptly reimburse Sellers for the amount of such Transfer Taxes actually paid by Sellers. Each Tax Return with respect to Transfer Taxes will be prepared and filed by the Party that customarily has primary responsibility for filing such Tax Return pursuant to applicable Law. Sellers and Buyer will use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes to the extent allowed under applicable Law, and will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate.

(b)    Buyer and Sellers agree to furnish or cause to be furnished to each other (and, in the case of Sellers, to any successor-in-interest of Sellers, such as a liquidating trust or other entity), upon request, as promptly as practicable, such information and assistance primarily relating to the Acquired Assets as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the claiming of any Tax refund, the preparation for any audit by any taxing authority, and the prosecution or defense of any claims, suit, or proceeding relating to any Tax (other than any proceeding between Buyer and Sellers); provided, however, that other than as required pursuant to this Section 7.1(b), in no event will (i) Sellers have access to any of the Tax Returns or other books and records of Buyer or any of its Affiliates (other than Tax Returns primarily related to the Acquired Assets), or (ii) Buyer have access to any of the Tax Returns of Sellers or other books and records of or any of its Affiliates. Any expenses incurred in furnishing such information or assistance pursuant to this Section 7.1(b) will be borne by the Party requesting it. Any information obtained pursuant to this Section 7.1(b) or pursuant to any other Section hereof providing for the sharing of information or review of any Tax Return or other schedule relating to Taxes will be kept confidential by the Parties and their respective Affiliates, except as necessary to be disclosed in connection with such return, audit, or examination, refund claim, proceedings, or determination, or as required by applicable Law.

(c)    Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer," and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

(d)      Any personal property or similar Taxes applicable to the Acquired Assets for a Straddle Period will be apportioned between the Parties on the number of days of the Straddle Period included in the Pre-Closing Tax Period and the number of days of the Straddle Period in the Post-Closing Tax Period. Sellers will be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Buyer will be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period. Sellers will pay to Buyer an amount equal to any such Taxes payable by Buyer that are attributable to the Pre-Closing Tax Period, and Buyer will pay to Sellers an amount equal to any such Taxes that have been paid by Sellers that are not attributable to the Pre-Closing Tax Period. Such payments will be made on the Closing Date or, if later, on the date such Taxes are due (or thereafter, promptly after request by Buyer or Sellers if such Taxes are not identified by Buyer or Sellers on or prior to the Closing Date).

Section 7.2    <u>Payments Received.</u> The Parties each agree that after the Closing, each of the Parties will hold and will promptly transfer and deliver to the other Party, from time to time as and when received by them, any cash, checks with appropriate endorsements (using each of their commercially reasonable efforts not to convert such checks into cash), or other property that they may receive on or after the Closing that properly belongs to the other Party, and will account to the other Party for all such receipts.

Section 7.3    <u>Information; Confidentiality.</u>

(a)      The terms of any confidentiality agreement to which Buyer (or an Affiliate of Buyer) is party in respect of Sellers (or any Affiliate of Sellers) will continue in full force and effect until the Closing, at which time Buyer's obligations under any such confidentiality agreement will terminate only insofar as they pertain to the Acquired Assets, and will otherwise remain in full force and effect in accordance with the terms thereof.

(b)      From the date hereof until the Closing (or the earlier termination of this Agreement), Sellers will provide Buyer and its Representatives with information concerning the Acquired Assets, as Buyer or any of its Representatives may reasonably request; provided, however, that in no event will Sellers be required to create any information in writing, electronic format, or otherwise (including but not limited to reports, records, or files) concerning the Acquired Assets that did not exist prior to such request of Buyer or any of its Representatives. Notwithstanding anything to the contrary in this Agreement, Sellers will not be required to disclose any attorney-client privileged information to Buyer or to make any disclosure that would violate any applicable Law or fiduciary duty.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions provided for in this Agreement is subject to the satisfaction or waiver by Buyer (to the extent waivable), at or prior to the Closing, of each of the following conditions:

Section 8.1 <u>Accuracy of Representations.</u> The representations and warranties of Sellers contained in Article IV will be true and correct as of the Effective Date and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties addressing matters as of a particular date will be true and correct as of such date); provided, however, that, other than in respect of Section 4.1, Section 4.2, and Section 4.6, the condition in this Section 8.1 will be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

Section 8.2 <u>Sellers' Performance.</u> Sellers have performed and complied in all material respects with the covenants and agreements that Sellers are required to perform or comply with pursuant to this Agreement at or prior to the Closing.

Section 8.3 <u>No Order.</u> No Governmental Authority has enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions provided for in this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer has taken all actions required to be taken by Buyer by Article VI to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 8.4 <u>Sellers' Deliveries.</u> Each of the deliveries required to be made to Buyer pursuant to Section 3.6 has been delivered.

Section 8.5 <u>Bankruptcy Court Approvals.</u> The Bankruptcy Court has entered the Sale Order, and the Sale Order is not subject to a stay pending appeal.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

Sellers' obligation to consummate the transactions provided for in this Agreement is subject to the satisfaction or waiver by Sellers (to the extent waivable), at or prior to the Closing, of each of the following conditions:

Section 9.1 <u>Accuracy of Representations.</u> The representations and warranties of Buyer contained in Article V will be true and correct as of the Effective Date and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties addressing matters only as of a particular date will be true and correct as of such date); provided, however, that, other than in respect of Section 5.1, Section 5.2, and Section 5.7, the condition in this Section 9.1 will be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to prevent or materially impair the ability of Buyer to consummate the transactions provided for in this Agreement. At the Closing, Sellers will receive a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 9.2   Buyer's Performance.   Buyer has performed and complied in all material respects with the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing. At the Closing, Sellers will receive a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 9.3   No Order.   No Closing Legal Impediment will be in effect; provided, however, that prior to asserting this condition Sellers have taken all actions required to be taken by Sellers by Article VI to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4   Buyer's Deliveries.   Each of the deliveries required to be made to Sellers pursuant to Section 3.5 has been delivered.

Section 9.5   Bankruptcy Court Approvals.   The Bankruptcy Court has entered the Sale Order, and the Sale Order is not subject to a stay pending appeal.

# ARTICLE X
# TERMINATION

Section 10.1   Termination Events.   Notwithstanding anything contained in this Agreement to the contrary (other than as provided in the last sentence of this Section 10.1), this Agreement may be terminated at any time prior to the Closing Date:

> (a)   By mutual written consent of Sellers and Buyer; or

> (b)   by either Sellers or Buyer:

> > (i)   if the Bankruptcy Court does not approve this Agreement for any reason or if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions provided for herein; provided, however, that the right to terminate this Agreement pursuant to this Section 10.1(b)(i) will not be available to any Party whose breach of any of its representations, warranties, covenants, or agreements contained herein results in such failure to approve such ruling or Order;

> > (ii)   if the Closing has not occurred by the close of business fourteen (14) days after the entry of the Sale Order (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 10.1(b)(ii) will not be available to any Party whose breach of any of such Party's representations, warranties, covenants, or agreements contained herein results in the failure of the Closing to be consummated by such time;

> > (iii)   if the Sale Order is vacated;

> > (iv)   if Sellers enter into a definitive agreement with respect to an Alternative Transaction; provided, however, that if Buyer is selected as the Next Highest Bidder in accordance with the Sale Procedures, then Buyer may not terminate this Agreement or withdraw its irrevocable offer unless and until such Alternative Transaction has closed;

(v) Sellers file any stand-alone plan of reorganization or liquidation contemplating an Alternative Transaction, or consummates an Alternative Transaction; or

(vi) The Sale Order is not entered within forty-five (45) days after the Sellers and the Buyer have all executed this Agreement.

(c) by Buyer:

(i) in the event of any breach by Sellers of any of Sellers' agreements, covenants, representations, or warranties contained herein that would result in the failure of a condition set forth in Article VIII to be satisfied, and the failure of Sellers to cure such breach by the earlier of (A) the Outside Date, and (B) the date that is fifteen (15) days after receipt of the Buyer Termination Notice; provided, however, that (1) Buyer is not in breach of any of Buyer's representations, warranties, covenants, or agreements contained herein in a manner that would result in the failure of a condition set forth in Article IX to be satisfied, (2) Buyer notifies Sellers in writing (the "Buyer Termination Notice") of Buyer's intention to exercise Buyer's rights under this Section 10.1(c)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant, or agreement contained herein of which Sellers are allegedly in breach;

(ii) if the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion provides for the transactions provided for in this Agreement; or

(iii) if any conditions to the obligations of Buyer set forth in Article VIII has become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d) by Sellers:

(i) except as provided in Section 10.1(d)(ii), in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations, or warranties contained herein that would result in the failure of a condition set forth in Article IX to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is fifteen (15) days after receipt of the Sellers Termination Notice; provided, however, that Sellers (1) are not themselves in material breach of any of Sellers' representations, warranties, covenants, or agreements contained herein, and (2) Sellers notify Buyer(s) in writing (the "Sellers Termination Notice") of Sellers' intention to exercise Sellers' rights under this Section 10.1(d)(i) as a result of the breach, and Sellers specify in the Sellers Termination Notice the representation, warranty, covenant, or agreement contained herein of which Buyer is allegedly in breach; or

(ii) if the Sale Order with respect to the transactions provided for in this Agreement has been entered and is not subject to any stay on enforcement and (A) Sellers have provided Buyer with written notice that Sellers are prepared to consummate the transactions provided for in this Agreement, (B) the conditions to Closing in Article VIII have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within one Business Day of Sellers providing Buyer with such notice.

Case: 23-30687    Doc# 445-3    Filed: 02/09/24    Entered: 02/09/24 22:34:49    Page 18 of 32

Section 10.2   Effect of Termination and Liquidated Damages.

(a)      Deposit.   If this Agreement is terminated pursuant to Section 10.1(d)(i) or Section 10.1(d)(ii), the Deposit will be retained by Sellers as liquidated damages (and Sellers will be permitted to direct Hilco Streambank to disburse the Deposit to Sellers), and the retention thereof will constitute the sole and exclusive remedy of Sellers in the event of such a termination hereunder. If this Agreement is terminated pursuant to any other provision of Article X (*i.e.*, except as described in the immediately preceding sentence), Sellers will promptly instruct Hilco Streambank to return the Deposit to Buyer in accordance with the Sale Procedures, and the return thereof and will constitute the sole and exclusive remedy of Buyer in the event of such a termination hereunder. Nothing in this Section 10.2 will relieve Sellers or Buyer from any Liability on account of fraud or be deemed to impair the right of any Party to compel specific performance by another Party of its obligations under this Agreement. The provisions of this Section 10.2 will survive any termination of this Agreement pursuant to Article X.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1   Notices.   All notices must be in writing and addressed to the relevant Party at its address set forth below (or to such other address that such Party specifies in accordance with this Section 11.1. All notices must be: (a) personally delivered, or (b) sent prepaid by: (1) a nationally recognized overnight courier service, or (2) certified mail, return receipt requested.  All notices will be effective upon the actual date of delivery.

*To Buyer*:
Primera Management I, L.L.C.
Att'n: Ori Sasson
1840 San Miguel Drive
Walnut Creet, CA 94596

*with a copy (which will not constitute notice) to:*

SIP Law, P.C.
Att'n: Maryam Naghavi
1501 Filbert Street
San Francisco, CA 94123

*To Sellers*:
Shift Technologies, Inc.
Att'n: Ayman Moussa, CEO
P.O. Box 1664
San Bruno, CA 94066-1664

*with a copy (which will not constitute notice) to:*

Keller Benvenutti Kim LLP
Att'n: Mr. Tobias S. Keller
425 Market Street, 26th Floor
San Francisco, CA 94105

Section 11.2    Entire Agreement. This Agreement constitutes the entire agreement between and among the Parties with respect to the subject matter of this Agreement and supersedes any and all prior negotiations, representations, agreements, and understandings, both oral and written. This Agreement will be binding upon the Parties and their respective successors and assigns. No change or amendment to this Agreement will be effective unless it is contained in a single document that is signed by all of the Parties who are signatories to it. Failure to insist upon strict compliance with any term or provision of this Agreement by any of the Parties will not be deemed to constitute a waiver by such Party of any of its rights upon a subsequent act or failure to act. Each Party acknowledges and agrees that in the event of any subsequent litigation, controversy, or dispute concerning this Agreement, none of them will be permitted to offer or introduce into evidence any oral testimony concerning any oral promises or oral agreements between or among them that contradicts the terms of this Agreement.

Section 11.3    No Presumption as to Drafting. Each of the Parties acknowledges that it has been represented by independent counsel in connection with this Agreement and the other Transaction Documents and the transactions provided for herein and thereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 11.4    Assignment. The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns. This Agreement, and the rights, interests and obligations hereunder, will not be assigned by any Party by operation of law or otherwise without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer will be permitted, upon prior notice to Sellers, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment will relieve Buyer of Buyer's obligations under this Agreement.

Section 11.5    Severability. If any provision of this Agreement is determined by the Bankruptcy Court to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability will not affect any other provision of this Agreement.

Section 11.6    Governing Law; Consent to Jurisdiction; Venue. This Agreement will be governed by and construed and enforced in accordance with the laws of the State of California, without regard to principles of conflicts of laws. Each of the Parties agrees that the Bankruptcy Court will have the exclusive jurisdiction to hear and determine any dispute, claim, or controversy between or among the Parties concerning the interpretation or enforcement of this Agreement, or any other matter arising out of or relating to this Agreement.

Section 11.7    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed to be an original as against the Party whose "ink original" or electronic or facsimile signature appears thereon, and all of such counterparts will together constitute one and the same instrument. Electronic and facsimile signatures will be effective for all purposes.

Section 11.8    No Third-Party Beneficiaries. Nothing in this Agreement will confer any rights, benefits, remedies, obligations, liabilities, or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 11.9    No Survival. None of the representations and warranties or covenants that require performance prior to the Closing ("Pre-Closing Covenants") contained in this Agreement or any Transaction Document delivered pursuant to hereto will survive the Closing or the termination of this Agreement. The Parties acknowledge and agree that: (a) the representations and warranties herein are intended to give effect to the closing conditions set forth in Articles VIII and IX;  (b) the Pre-Closing Covenants are intended to give effect to the closing conditions set forth in Articles VIII and IX; and (c) no claim of any kind based on the failure of any representation or warranty to have been true and correct, or based on the failure of any Pre-Closing Covenant to have been performed or complied with, may be brought at any time after the Closing. All covenants and agreements contained herein that by their terms are to be performed after the Closing, or that prohibit actions after the Closing, will survive the Closing in accordance with their terms.

Section 11.10   Publicity. Neither Party nor any of their respective Representatives may issue any press release or make any other public disclosure regarding the existence of this Agreement or the other Transaction Documents, its or their contents, or the transactions provided for in this Agreement or the other Transaction Documents, without the written consent of the other Party, in any case, as to the form, content, and timing and manner of distribution or publication of such press release or other public disclosure (which consent may not be unreasonably withheld, conditioned, or delayed). Following the Closing, (a) Buyer will be permitted to make one or more public statements that it has acquired the Acquired Assets, and (b) Hilco Streambank will be permitted to make one or more public statements that it has acted as Sellers' intellectual property advisor.

*[Signature page follows]*

20

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

***Buyer*:**

Primera Management I, L.L.C.

By: _Ori Sasson_ _____
DocuSigned by:
173009AAB03047B...
Ori Sasson, Partner

[*Signature page continues*]

***Sellers*:**

Shift Technologies, Inc.

Shift Platform, Inc.

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

Shift Finance, LLC

Shift Operations LLC

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

Shift Transportation LLC

Shift Insurance Services LLC

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

Shift Marketplace Holdings, LLC

Shift Marketplace, LLC

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

Fair Dealer Services, LLC

CarLotz, Inc., a Delaware Corporation

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

CarLotz Group, Inc.

CarLotz Nevada, LLC

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

[*Signature page continues*]

CarLotz California, LLC                          CarLotz, Inc., an Illinois Corporation


By:_____       By:_____
Scott Hodgdon, General Counsel & Corporate    Scott Hodgdon, General Counsel & Corporate
Secretary                                     Secretary

CarLotz Logistics, LLC                        Orange Peel, LLC


By:_____       By:_____
Scott Hodgdon, General Counsel & Corporate    Scott Hodgdon, General Counsel & Corporate
Secretary                                     Secretary

Orange Grove Fleet Solutions, LLC


By:_____
Scott Hodgdon, General Counsel & Corporate
Secretary

DocuSign Envelope ID: C60728E1-0FAD-4497-A955-E6D97914F2F0

**Exhibit A**

<u>Sale Procedures Order</u>

*Attached.*

DocuSign Envelope ID: C60728E1-0FAD-4497-A955-E6D97914F2F0

**Exhibit B**

<u>(Proposed) Sale Order</u>

*Attached.*

## Schedule 1.1

*[Intentionally left blank]*

**Schedule 1.2**

[*Intentionally left blank*]

**Schedule 1.3**

Domain Names

**Fair.com Domain Names**

| Domain Name | Domain Registrar |
|---|---|
| fair.com | MarkMonitor |
| fair.engineering | MarkMonitor |
| fair.fail | MarkMonitor |
| fair.fyi | MarkMonitor |
| faircorp.net | MarkMonitor |
| fairfinancial.com | MarkMonitor |
| fairloan.com | MarkMonitor |
| fairmail.com | MarkMonitor |
| fairtechnologies.com | MarkMonitor |
| fairtradein.com | MarkMonitor |

## Schedule 1.4

[*Intentionally left blank*]

## Schedule 1.5

<u>Social Media Accounts</u>

| Platform | Handle | Reach |
|----------|--------|-------|
| Twitter | Fair.com | 10k followers |

# Schedule 1.6

*[Intentionally left blank]*